# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARY CROOK,** | ) | **Case No. 3:10-cv-00445** |
| | ) | **(Lead Case)** |
| **Plaintiff,** | ) | |
| | ) | **Consolidated With** |
| **v.** | ) | |
| | ) | **No. 2:10-cv-00099** |
| | ) | |
| **SIMPSON STRONG-TIE COMPANY, INC.** | ) | **Judge Trauger** |
| | ) | |
| **Defendant.** | ) | |

*************************************************************************

| | | |
|---|---|---|
| **CAROLYN SULLIVAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 2:10-cv-00100** |
| | ) | |
| **v.** | ) | **Judge Trauger** |
| | ) | |
| **SIMPSON STRONG-TIE COMPANY, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

The defendant has filed a Motion for Summary Judgment as to plaintiff Mary Crook

(Case No. 3:10-cv-00445 (hereinafter "Crook Docket"), Docket No. 35)[1] with a supporting

---

[1] Crook's claims reflect counts asserted in two now-consolidated lawsuits. Crook originally filed an action in Tennessee state court on April 1, 2010, asserting a single cause of action for retaliation under Tennessee common law. (*See* Crook Docket No. 1, Ex. A.) The defendant removed that single-count action to this court on May 5, 2010. (Crook Docket No. 1.) Crook then filed a separate complaint against SST in this court on October 27, 2010 (Case No. 2:10-cv-00099, Docket No. 1), asserting multiple federal and state law statutory discrimination and retaliation claims. The court consolidated the two actions and designated the earlier-docketed case (Case No. 3:10-cv-00445) as the lead case. Unless otherwise noted, Crook Docket references relate to the lead case docket, Case No. 3:10-cv-00445.

1

memorandum (Crook Docket No. 36), which Crook has opposed (Crook Docket No. 45), and the defendant has filed a reply (Crook Docket No. 48). The defendant has also filed a Motion for Summary Judgment as to plaintiff Carolyn Sullivan (Case No. 2:10-cv-00100 (hereinafter "Sullivan Docket"), Docket No. 21)[2] with a supporting memorandum (Sullivan Docket No. 22), which Sullivan has opposed (Sullivan Docket No. 31), and the defendant has filed a reply (Sullivan Docket No. 34). For the reasons stated herein, both motions will be **GRANTED**.

## BACKGROUND

### I. The Plaintiffs' Claims

Plaintiffs Mary Crook and Carolyn Sullivan ("Plaintiffs") are sisters who were formerly employed by the defendant, Simpson Strong-Tie Company, Inc. ("SST"), at SST's plant in Gallatin, Tennessee. Both Plaintiffs suffered workplace injuries at the plant for which they received workers' compensation during their period of employment. In early 2009, SST terminated 17 Gallatin plant employees, including the Plaintiffs.

The Plaintiffs contend that SST terminated them in retaliation for filing workers' compensation claims and/or because of their gender. Specifically, the Plaintiffs each assert the following claims:

(1)     Gender discrimination, in violation of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981 and 1983;

(2)     Gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*;

_____

[2]Plaintiff Sullivan filed a multiple-count action against the defendant on October 27, 2010, asserting substantially the same claims that Crook had asserted, collectively, in her two lawsuits. (Sullivan Docket No. 1) Accordingly, the court designated Sullivan's parallel action as a related case.

(3)     Retaliation for engaging in protected activity, in violation of the THRA and Title VII;

(4)     Retaliation for filing a workers' compensation claim, in violation of Tennessee common law.

In their respective opposition briefs, the Plaintiffs also assert that they are entitled to relief under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304(a).

## II.     Common Factual Background[3]

SST is a subsidiary of Simpson Manufacturing Co., Inc., a publicly traded company that manufactures and sells a variety of fastener and other products used in the construction industry, including home building.  SST operates multiple manufacturing plants in the United States and abroad, including the Gallatin, Tennessee plant where the Plaintiffs worked.  The Gallatin plant assembles SST's patented "Quik Drive" Auto-Feed Screw Driving Systems (a gun-like screw application device) and collated screw strips used with the Quik Drive product.  The Plaintiffs were originally hired by Quik Drive, which SST acquired in October 2004.

Operational employees at the Gallatin plant originally worked in one of three non-overlapping eight-hour shifts – the "first shift," "second shift," and "third shift," respectively.  At an unspecified point before 2008, the second shift was eliminated, but the remaining shifts continued to be referred to as the first and third shifts.

_____

[3]Unless otherwise noted, all facts cited herein are drawn from the parties' statements of undisputed facts and the responses thereto (Crook Docket Nos. 37, 46, 47, and 49; Sullivan Docket Nos. 23, 32, 33, and 35), the declarations of Melissa Whited in support of SST's motions (Crook Docket No. 38 at Ex. A; Sullivan Docket No. 24 at Ex. A), and the non-case law exhibits filed in support of the parties' briefs (Crook Docket No. 38 at Exs. B-G and No. 48 at Exs. A-I; Sullivan Docket No. 24 at Exs. A-G and No. 34 at Exs. A-H.)  The court draws all inferences in favor of the non-moving party.  *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

In the second half of 2008, due to the slowing economy and its effect on the home building market, demand for SST's Quik Drive products fell by more than 50%. Consequently, from late 2008 through early 2009, SST undertook cost-cutting measures at the Gallatin plant: it terminated the five remaining temporary employees, did not replace a shipping employee who quit, limited most Production and Tool Assembly Unit employees to a maximum of 32 hours per week, shut down the Production and Tool Assembly Units for two weeks, and announced that, effective, January 5, 2009, it would eliminate the third shift and consolidate the third shift workers into the first shift.[4]

At the end of 2008, SST employed 33 operational workers at the Gallatin plant, including 21 women and 12 men. Due to the reduced production needs, SST made a business decision to reduce this workforce significantly. Bill Georges, the Operations Manager for SST's Quik Drive product line, asked department heads reporting to him to identify which employees could be terminated while continuing to meet the (reduced) production needs. These department heads included, *inter alia*, Collating Department Head Doug Mangrum, who supervised Crook; Quality Department Head Laura Cordray, who supervised Sullivan; and Production Department Head Jim Joseph, who also held the title of Plant Manager. Accordingly, Mangrum was tasked with recommending which of his subordinates, including Crook, should be terminated, while Cordray was tasked with recommending which of her subordinates, including Sullivan, should be terminated. Ultimate responsibility for the terminations rested with Georges.

The reductions in force at the Gallatin plant were carried out in two waves. In the first

---

[4]The Plaintiffs attempt to characterize the market contraction as a "typical seasonal slowdown," citing to their own deposition testimony. (Crook Docket No. 49, Fact No. 20; Sullivan Docket No. 35, Fact No. 31.) The referenced testimony does not support their self-serving contentions, which, in any case, contradict the otherwise undisputed facts.

wave, which took place between January 15 and February 12, 2009, SST terminated six female non-supervisory employees, including Sullivan, whom Cordray had recommended for termination. Each of these employees was designated as "eligible for rehire" on the Personnel Status Change Notices maintained in their personnel records. Three of these women, including Sullivan, had previously incurred workers' compensation injuries, while the other three had not.

In the second wave, which took place in April 2009, SST terminated the following 11 employees: five non-supervisory male employees, two of whom had incurred workers' compensation injuries; five non-supervisory female employees, two of whom had incurred workers' compensation injuries; and one supervisory female employee, Crook, who had incurred a workers' compensation injury.[5] Thus, in the two waves of layoffs, SST terminated 17 of its 33 Gallatin plant workers, including 12 of the 21 women and five of the 12 men. SST ultimately rehired two of these employees who re-applied for work: a female tool assembler previously terminated in the first wave and a male production worker previously terminated in the second wave.

SST has filed a verified chart of information concerning all employees at SST who suffered workers' compensation injuries from 2005 forward. Of those 24 individuals, seven were terminated as part of the two waves of layoffs in early 2009, while 17 were retained. Of the 17 employees who were retained, three later quit, one was terminated for misconduct, and 13 are still employed by SST.

## III. Facts Specific to Crook

Quik Drive hired Crook on October 16, 1995 as a machine operator on the second shift.

---

[5]Each of these employees was delegated as "eligible for rehire" on the Personnel Status Change Notices maintained in their personnel records.

Crook was later trained as a lead hand on this shift and was ultimately promoted to a supervisory role on the third shift. From approximately October 1997 through her termination in April 2009, Crook reported directly to Mangrum, the Collating Department Manager.[6]

Crook alleges that Mangrum treated women differently from male co-workers. Specifically, Crook testified that Mangrum permitted the first shift supervisor in the Collating Department, Bobby Burkett, to be relieved of certain tasks that Burkett did not want to do but did not grant the same accommodation to Crook.[7] Crook also testified that Mangrum permitted male workers to "get away with more stuff than the girls" (Crook Docket No. 48, Ex. C, Crook Deposition Transcript ("Crook Dep."), at 31:25-32:1), pulled male workers off of machine operation in favor of other duties, and permitted male workers to sweep the parking lot to get fresh air while keeping the female employees inside the building. It is not clear from the record when this alleged conduct occurred or how often.

On February 14, 2006, Crook sustained a workplace injury when a dock door fell on her shoulder, but she did not initially miss any work. SST reported the injury to its workers' compensation insurance carrier, The Hartford, which accepted the claim and paid for Crook's medical expenses, including doctors' appointments and physical therapy.

In July 2006, Mangrum gave Crook a "very good" overall rating on her performance

---

[6]When SST acquired Quik Drive in October 2004, Crook was working as the third shift supervisor within the Collating Department.

[7]Burkett and Crook worked on different, non-overlapping shifts through January 2009. As SST points out, it is not clear how Crook could have personal knowledge of any activity taking place on the first shift prior to that time. Furthermore, it appears that Crook only appeared for the first shift a handful of times thereafter, including a brief appearance on January 5, 2009 – when, for reasons described below, she left for the day without working – full shifts on January 28, 29, and 30, and, at most, three weeks of shifts between March 7 and April 2, 2009, when SST terminated Crook.

evaluation and, as a result, Crook received a pay raise. In December 2006, Crook hired a workers' compensation attorney. In July 2007, Mangrum again gave Crook a "very good" overall rating on her performance appraisal and, as result, Crook received another pay raise.[8]

Crook did not miss work due to her injury until August 16, 2007, when she had lower back surgery, for which The Hartford paid. Following the surgery, Crook remained off work until October 7, 2007 (*i.e.*, for approximately two months), when she returned with several workplace medical restrictions imposed by her doctor. Crook resumed her role as a third shift supervisor under Mangrum, who expressed no problems with her restrictions and sought to accommodate them. For example, although supervisors typically were required to perform "break coverage," in which the supervisor operated a subordinate's machine while the subordinate took a short break (such as for lunch), Mangrum relieved Crook of this duty. Mangrum also relieved Crook of other physically demanding operational tasks, such as opening skids and performing certain forms of machine maintenance. Mangrum also provided Crook a cot on which to lie down.

On May 29, 2008, due to further complications from the February 2006 injury, Crook had neck surgery, which the Hartford ultimately paid for. Because of the surgery, Crook remained out of work through September 7, 2008 (*i.e.*, for approximately three months), during which time she received workers' compensation temporary total disability payments.

On September 7, 2008, Crook resumed her third shift supervisor position, subject to several medical restrictions imposed by her doctor. Again, SST did not express any problems with these restrictions. On September 28, 2008, three weeks after Crook had returned to work

---

[8]The record does not indicate whether Mangrum was aware that Crook had filed a workers' compensation claim or that she had retained a workers' compensation attorney.

7

following the three-month absence, Mangrum gave Crook a performance appraisal with an overall rating of "very good" and, again, Crook received a pay raise, her third in as many years.

After demand for SST's products plummeted in late 2008, SST eliminated the third shift and transferred Crook and several other third shift employees over to the first shift. In particular, Mangrum moved Crook to the first shift to preserve her job as long as possible. The consolidation resulted in substantial duplication in responsibilities between the members of the now-defunct third shift and the existing first shift employees. For instance, the first shift already had a longstanding Collating Department supervisor, Bobby Burkett, who had been working at the Gallatin plant longer than Crook and had become a supervisor before she did. The shift also already had three lead hands (Chris Biggs, Chris Rittenberry, and "Shawna"), to which the consolidation added a fourth lead hand, "Hank," who had previously served as lead hand on the third shift. At deposition, Crook admitted that, after the shift consolidation, SST was obviously carrying more employees than necessary to meet production demands. (Crook Dep. at 72:12-73:7.) Indeed, in her new role on the first shift, Crook was no longer responsible for managing other employees – a responsibility that remained with the existing supervisor, Burkett. Nevertheless, SST continued to pay Crook her supervisory-level wage.

On January 5, 2009, the first day of the newly consolidated shift, Mangrum assigned responsibilities to all members of the shift. In an effort to find a continuing role for Crook, Mangrum assigned Crook to cover breaks on what he thought were the two lightest machines, which Mangrum believed Crook could operate, as necessary, "well within her [medical] limitations." (Crook Docket No. 48, Ex. D, Mangrum Deposition Transcript ("Mangrum Dep."), at 26:5-10.) Mangrum also assigned Shawna (female lead hand) and Hank (male lead hand) to

cover breaks on the other, heavier machines. Mangrum did not assign Biggs or Rittenberry (male lead hands) to perform break coverage, but instead assigned them to perform other work.

Notwithstanding Mangrum's attempt to find a continuing role for Crook, Crook immediately became upset with her new responsibilities. She confronted Mangrum to ask why she was being required to cover breaks.[9] Mangrum told Crook to raise her concern with Melissa Whited, the Human Resources Director. Accordingly, Crook immediately spoke to Whited and complained that she did not understand why she had been assigned breaks while two other lead hands (Biggs and Rittenberry) had not. Crook complained that "[i]t's a lead hand's place to do the breaks, not supervisors," and noted that Burkett was not covering breaks, either. That same day, following the initial meeting with Whited, Crook participated in a meeting with Whited, Joseph, and Mangrum. They informed Crook that, if she could not work breaks, she would need to go home because they had no other work for her. Mangrum and Joseph also told Crook that Biggs and Wittenberry were doing "special jobs" (Crook Dep. at 70:15-17), but Crook complained that Biggs and Rittenberry were just "standing there doing nothing." (*Id.* at 68:14-24.) Crook then left the facility for the day. Crook has not identified any record evidence demonstrating that she complained about gender discrimination during any of these January 5, 2009 meetings or, for that matter, at any point prior to her termination.[10]

---

[9]Although Crook's counsel alleges that the light machine break coverage was outside of Crook's medical restrictions, by reference to Crook's deposition testimony (*see* Crook Docket No. 23, Fact No. 23 (citing to Crook Dep. at pp. 55-57)), the referenced testimony is in fact equivocal on this point. (*See* Crook Dep. at 58:3-24.) Regardless, Crook does not dispute that Mangrum subjectively believed that the tasks were within her medical restrictions.

[10]Crook's testimony at most establishes that she subjectively believed that she was assigned break coverage because she is female, but it does not indicate that Crook expressed concerns about gender discrimination to management before her termination. Based on the record, it appears that the crux of Crook's complaint on January 5, 2009 was that she was being

On January 7, 2009, two days later, Crook saw her doctor, who permitted her to return her to work with additional medical restrictions, including a repetitive motion restriction. SST informed Crook that no work was available that conformed to the new repetitive motion restriction. Crook then consulted with her doctor again, who removed the repetitive motion restriction. Crook then met with Whited, Mangrum, and Joseph, informing them that she would attempt to perform her job with the assigned break coverage. Crook worked from January 26 through January 28, during which time she performed the assigned break relief and other tasks.

On February 2, 2009, Mangrum informed Crook that, to meet a rush order on a particular part, he was temporarily re-opening the second shift to have a single employee run certain washer machines. For safety purposes, he asked Crook to supervise this one employee, a role that required minimal physical effort.[11] Crook performed this work, which conformed to her medical restrictions, for approximately six weeks.

On or about March 7, 2009, Mangrum informed Crook that rush work on the second shift was no longer necessary and, therefore, he transferred Crook back to the first shift. Crook testified that, at this time, her first shift duties required her to lift boxes weighing more than 15 pounds, a task outside of Crook's medical restrictions. According to Crook, Mangrum told her she had to perform these tasks or "go home" because there was no other work for her to perform.

----

asked to perform work that was not typically assigned to a supervisor. For example, when asked at deposition why she believed that the assignment reflected gender discrimination, Crook responded as follows: "[*T*]*hat was not part of my job title*, to do breaks, when there was two male lead hands standing there doing nothing, because that was the job of a lead hand. And *I was not classified as a lead hand; I was classified as a supervisor*." (Crook Dep. at 66:24-67:7) (emphases added).

[11]According to Crook, Mangrum told her to "[j]ust sit and supervise her. As long as you're inside this building, you can sit in the office and sleep, you can do whatever you want to.") (Crook Dep. at 91:15-19.)

It appears that Crook performed this work for approximately one or two weeks.

At some point prior to the late 2008 market contraction, SST had agreed to move its Quik Drive Gallatin plant operation to a new facility. Accordingly, in early 2009, SST began the process of moving its production operation to the new building. This process involved, among other things, moving its production equipment and setting up that equipment at the new facility. At some point after March 7, 2009 (when Crook returned from the six-week temporary second shift), Mangrum asked Crook to place tags on plant equipment in preparation for the plant move.[12] Crook alleges that she then approached Mangrum to speak with him about this task. Joseph was present when she spoke to Mangrum, who addressed her question. She claims that, as she was leaving Mangrum's office, Joseph told her, "Don't be picking up anything, pulling on anything, lifting on anything. Just sit down and let somebody else, a man come around and help you because you've already costed [sic] the company enough blankety money." (Crook Dep. at 100:22-101:1.)

During this time frame, Mangrum was tasked by Georges with identifying which of Mangrum's subordinates, including Crook, could be terminated while meeting the reduced production needs. In deciding which employees to terminate, Mangrum considered the employees' mechanical capabilities and general knowledge of SST's production processes. Mangrum selected Crook to be included in the second wave of reductions because he could no longer justify maintaining two supervisors on the first shift. Mangrum elected to keep Burkett rather than Crook because, in Mangrum's opinion, Burkett had greater mechanical knowledge

_____

[12]In an effort to preserve its employees' jobs as long as possible, SST apparently assigned some of its operational employees to perform make-work tasks associated with the move, including tagging plant equipment (assigned to Crook), as well as painting and cleaning the new building (assigned to other employees).

than Crook and was better able to perform certain machine set-up tasks. Mangrum testified that "[Crook] did not have the knowledge that the other supervisor did. I could not just give her a screw and say, 'Here, get this run.' And Bobby Burkett had that knowledge. He was there before I was." (Mangrum Dep. at 28:3-6.) Furthermore, Mangrum was concerned that Crook's medical restrictions would prevent her from performing various necessary tasks at the new plant.

On April 2, 2009, Whited and Joseph met with Crook and informed her that she was being terminated. They told her that, due to the difficult economy, SST had to lay off some of its Gallatin plant workforce. According to Crook, Joseph told her, "This is nothing personal to anybody. Even if you have restrictions or not, this is nothing personal. We're just going to have to let some people go. Maybe the future will look bright and things will get better." (Crook Dep. at 108:18-22.) Joseph also allegedly told Crook, "Don't take it personally or anything about the response that – the comment that I made in there about restrictions and stuff. That wasn't anything towards you." (*Id.* at 110:14-19.)

Since her termination, Crook has been physically unable to work and, as a consequence, has been awarded Social Security disability benefits.[13]

---

[13]Crook's response to SST's statement of facts purports to dispute that she was not able to work after her termination, citing to an "Affidavit of Plaintiff." (Crook Docket No. 47, Response to Fact No. 35.) Similarly, Crook cites to this affidavit in response to other facts asserted by SST and in her own statement of facts as well. (*See, e.g.*, Crook Docket No. 49, Fact No. 57 (alleging that "Plaintiff had equivalent capabilities and knowledge to that of Burkett")). However, Crook's counsel did not file this affidavit. SST's counsel emailed Crook's counsel to inquire about the factual references premised on this unfiled affidavit. (*Id.*) Crook's counsel responded that inclusion of this unfiled affidavit – and, presumably, all references thereto – reflected an "inadvertent mistake." (Crook Docket No. 48, Ex. I.) Crook's counsel promised to "file 'something' to remove the usage of the term 'affidavit,'" *id.* (quotation marks in original), but apparently did not do so.

Absent vigilance by SST's counsel in identifying this issue and bringing it to the court's attention, the court may have been left with the impression that there are genuine disputes

In early 2009, Biggs, a Collating Department lead hand, took a voluntarily furlough. At some point during or soon after the second wave of terminations, SST ended Biggs' furlough and returned him to work, at Mangrum's behest. Mangrum chose to return Biggs to work because Biggs' particular skills were needed in relocating machines from the old building to the new building, including setting up and adjusting the machines in the new facility. In particular, Biggs had received specialized training in performing certain tasks that Crook had not received, including set ups for new sizes of screws and changing chain sizes on the machines.[14] Crook points out that she previously worked as a second shift lead hand many years earlier, but she offers no evidence rebutting SST's contention that Biggs possessed certain business-related knowledge and skills that she did not.[15]

_____

concerning material factual issues, when in fact there are not. For example, as described *infra* at pp. 31-37, the fact that Crook was unable to work following her termination undermines her allegations that SST failed to rehire her in retaliation for filing a workers' compensation claim, in retaliation for complaining about gender discrimination, and/or because of her gender. Crook's filings purport to create a dispute of fact on this point where none exists. The other purported factual "disputes" premised on the unfiled affidavit are of similar relevance to the disposition of Crook's claims.

The court is troubled by these events. Crook's counsel not only made unsupported factual representations to the court in Crook's opposition papers, but also failed to remove these allegations from the record and/or bring the matter to the court's attention even after being apprised of and acknowledging the issue. Crook's counsel is reminded that, by filing papers with the court, counsel is thereby representing that all factual contentions and all denials of factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11(b)(3)-(4) (2011). In light of the foregoing, the court has disregarded all alleged facts and factual disputes asserted by Crook that purport to rely on Crook's unfiled/rescinded affidavit.

[14]The chains weighed between 25 and 35 pounds. Due to Crook's medical restriction against lifting objects over 15 pounds, Crook had not received training concerning changing these heavy chains.

[15]Purporting to rely on the unfiled affidavit, Crook's counsel alleges that, "[a]fter the layoff/termination, Mangrum rehired male employee Chris Biggs as a lead hand position Plaintiff had previously held and was capable of doing." (Crook Docket No. 49, Fact No. 58.)

On July 9, 2009, just over three months after her termination, Crook settled her worker's compensation claim. In September 2009, Crook filed a discrimination charge against SST with the Equal Opportunity Employment Commission ("EEOC") and the Tennessee Human Rights Commission ("THRC").

SST did not rehire Crook.

## IV.    Facts Specific to Sullivan

Sullivan was hired by Quik Drive on April 6, 1998 as a collating machine operator. In March 2005, she sustained a rotator cuff injury to her right shoulder, which she reported to SST as a workers' compensation injury in April 2005. SST's insurance carrier accepted the claim without dispute. Sullivan received treatment and ultimately required shoulder surgery in September 2005. Prior to her surgery, Sullivan missed just two days of work due to the injury, for which she received workers' compensation temporary income benefits. Sullivan's doctor did not assign her a permanency rating.[16] In July 2005, approximately three months after Sullivan had reported the workers' compensation injury, SST granted Sullivan a pay raise.

Due to the surgery, Sullivan remained off work until January 2006, when she returned to work. Sullivan's doctor indicated that the previous medical restrictions were permanent, but did not impose a permanency rating. While she was off of work, Sullivan received workers'

---

Although other record evidence establishes that, at some early point in her employment at SST, Crook had held the position of lead hand, Crook has not identified record evidence demonstrating that she was capable of performing the work assigned to Biggs after he returned from furlough.

[16]Under the Tennessee Workers' Compensation Act, an employee may receive compensation for permanent partial disabilities under a statutory formula that incorporates an objective percentage disability rating, or permanency rating. *See* Tenn. Code Ann. § 50-6-207 (2011).

compensation temporary income benefits.  Upon returning to work, Sullivan initially resumed work as a machine operator, but after two or three days reported that her arm was hurting, at which point she was assigned to a lighter machine.  In April 2006, Sullivan complained to Whited about continued pain in her shoulder.  In consultation with The Hartford, Whited arranged for Sullivan to consult with a different doctor, apparently to seek a second opinion.

On May 29, 2006, SST asked Sullivan if she wanted to work in a Quality Control Technician position that would relieve her of operating a machine.  Sullivan appreciated this opportunity and transferred into the position.  The new position involved performing various performance tests on incoming screw products, activities that were within her medical restrictions.  Sullivan remained in this position through her termination in January 2009.

In July 2006, Sullivan's supervisor in the Quality Control Unit, Yolanda Nelson, gave Sullivan a "very good" performance appraisal rating and granted Sullivan a pay increase.

On February 19, 2007, Sullivan's physician released her to full duty, thereby ending Sullivan's treatment for the March 2005 shoulder injury.  Sullivan did not receive a permanency rating at this time either.

In July 2007, Cordray, the new Quality Manager for Sullivan's department, gave Sullivan a "good" rating with several positive comments, but also noted that Sullivan had certain areas needing improvement.  Sullivan received another raise as a result of the review.

In December 2007, Sullivan retained a workers' compensation attorney.  Through this attorney, Sullivan saw another doctor, who, after a single examination, assigned her a 12% permanency rating.  Following this assessment, Sullivan apparently disagreed with SST's carrier as to whether a permanency rating was appropriate and unsuccessfully attempted to settle the

claim in June 2007.

Sullivan continued to perform her job without any restriction or further medical treatment. In August 2008, Cordray gave Sullivan another relatively positive review that also suggested several areas in which Sullivan needed to expand her knowledge of applicable quality tests and procedures. As a result of this review, Sullivan received another pay increase.

By the latter half of 2008, the Quality Control Department contained just three employees: Sullivan, the Quality Control Technician; Marge Smith, the Quality Lead, a higher position than Sullivan's with more responsibility; and Quality Manager Cordray, Sullivan's ultimate supervisor. Smith, who had been hired October 2007, had more than 20 years of prior manufacturing quality experience, including experience as a quality manager. Smith supervised Sullivan in the quality lab.

In Fall 2008, Georges asked Cordray to determine whether any of her employees (effectively, Smith and/or Sullivan) could be terminated as part of the reduction in force. Cordray determined that the Quality Department could continue to function effectively with one fewer employee, because the overall decrease in production resulted in a concomitant decrease in the amount of incoming product to be tested for quality. As between Sullivan and Smith, Cordray recommended Sullivan for termination because Smith was in a higher position, was more knowledgeable concerning quality testing operations, and performed a broader range of duties than Sullivan.[17] Pursuant to Cordrary's recommendation, Sullivan was terminated in the

---

[17]Sullivan purports to create a factual dispute regarding whether her skills matched those of Smith, by reference to Cordray's deposition testimony. (Sullivan Docket No. 35, Ex. 1 at Fact Nos. 51-53.) To the extent this consideration is even relevant to her claims, Sullivan mischaracterizes the underlying testimony, which demonstrates that, at least in Cordray's view, Smith was more proficient than Sullivan in a variety of lab-related tasks, was able to perform certain tasks that Sullivan could not, and was much more comfortable than Sullivan in dealing

first wave of layoffs, along with five other female workers.

Sullivan alleges that, in December 2008, about a month before her termination, Joseph saw her picking up a UPS box and told her, "Don't be picking that up. You know you're going to get hurt and you've done cost this factory enough money." (Sullivan Docket No. 34, Ex. B, Sullivan Deposition Transcript ("Sullivan Dep."), at 84:15-22.) Finally, Smith testified that, at an unspecified point, she heard Joseph suggest that, if the women needed help lifting boxes, he could get a man to do it. However, Smith also testified that she never heard Joseph express, in substance, that men were better able to do jobs at the plant than women.

In January 2009, just before her termination, Sullivan settled her workers' compensation claim with SST's insurance carrier. Sullivan reached a favorable settlement that included a lump sum payment of $15,000, equivalent to a 12% permanency rating. Prior to that settlement, SST's carrier had already paid out approximately $33,000 for Sullivan's medical expenses. Sullivan claims that was scheduled to pick up her settlement check from her attorney on February 13, 2009.

On February 11, 2009, Cordray showed Sullivan the new building and indicated where Sullivan would be working. Nevertheless, on February 12, 2009, Whited and Cordray met with Sullivan to inform her that she had been terminated. According to Sullivan, Cordray told Sullivan that "she hated to [terminate me] because, you know, I had been sick before. I had been having trouble with my chest. And she said she hated to do it, but they'd been wanting to do it for some time. And she had talked Joseph out of not doing it for awhile [sic], and that there just

with internal and external auditors. (*See* Sullivan Docket No. 34, Ex. D, Cordray Deposition Transcript, at pp. 20:17-23:12.)

wasn't no work."[18]  (Sullivan Dep. at 77:11-77:20.)  Sullivan was listed as "eligible for rehire."

Due to her termination, Sullivan reopened her workers' compensation claim to seek additional compensation.  The parties ultimately settled the claim in April 2009 for an additional lump sum payment of approximately $25,000.

Following Sullivan's termination, SST may have utilized certain of its remaining employees to perform some of the work that Sullivan had been doing before she was terminated. Of the employees terminated in the early 2009 layoffs, SST did not rehire any to work in the Quality Department.

Following Sullivan's termination, SST obtained new, sophisticated quality testing equipment.  Thereafter, in October 2009, SST hired a new lab technician, Paula Andrews, initially on a temporary basis and ultimately on a full-time basis.  Andrews had 20 years of prior experience and was familiar with the new types of lab equipment that SST had acquired after Sullivan was terminated.  Notwithstanding her previous experience, Andrews received additional training on the new equipment after SST hired her.  There is no evidence in the record that SST hired any male employees to work in the Quality Department after Sullivan was terminated.

On September 25, 2009, Sullivan filed a charge of discrimination against SST with the EEOC and THRC.  SST did not rehire Sullivan.

## ANALYSIS

## I.     Summary Judgment Standard

---

[18]Citing to her own testimony, Sullivan alleges that "Cordray told Plaintiff that due to her sickness and lack of work she was being terminated."  (Sullivan Docket No. 31 at p. 3.) Sullivan's counsel has mischaracterized the testimony.  Sullivan in fact testified that Cordray said there was no work available for Sullivan to perform and that, because of Sullivan's apparent chest illness – which bore no relationship to Sullivan's workers' compensation injury or claim – Cordray had attempted to postpone terminating Sullivan for as long as possible.

The court must grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## II. Crook and Sullivan's Claims Under 42 U.S.C § 1981, 42 U.S.C. § 1983, the THRA, and the TPPA.

Summary judgment is plainly appropriate on the Plaintiffs' claims asserted under 42 U.S.C. § 1981, 42 U.S.C. § 1983, the THRA, and the TPPA.

As an initial matter, Crook does not address SST's arguments that summary judgment on Crook's claims under § 1981, § 1983, and the THRA are appropriate. For this reason alone, the court could view these claims as abandoned and grant summary judgment. *See Gibson-Homes v.*

*Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009). In any case, summary judgment

on these statutory claims is plainly appropriate for the following reasons:

- Claims of gender discrimination are not cognizable under § 1981. *Jachyra v. City of Southfield*, 97 F.3d 1452, at *2 (6th Cir. Sept. 12, 1996) (unpublished).

- Claims under § 1983 require that the defendant acted under color of state law, *id.* at *3, which SST did not.

- Claims under the THRA must be brought within one year of accrual, Tenn. Code Ann. § 4-21-311(d) (2011). However, Crook did not assert her THRA claim until October 27, 2011, more than two years after her April 2009 termination. Similarly, Sullivan did not assert her THRA claim until October 27, 2011, more than two and one-half years after her February 12, 2009 termination. Accordingly, the THRA claims are time-barred. *See Gibson-Homes*, 661 F. Supp. 2d at 912.[19]

As to the TPPA claims asserted in the Plaintiffs' Response briefs, the TPPA is simply not

applicable to this case. The TPPA, also known as the Tennessee Whistleblower Act, provides

that no employee shall be "discharged or terminated solely for refusing to participate in, or to

remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b) (2011). Claims under the

TPPA must be brought within one year of discharge.[20] *Farmer v. Tenn. Dep't of Safety*, 228

---

[19]Even if the Plaintiffs' THRA claims were not time-barred, they would fail on the merits, at both the *prima facie* and rebuttal stages, for the same reasons as their Title VII claims discussed hereafter. *See Reed v. Inland Intermodal Logistics Servs., Inc.*, No. 09-2607, 2011 WL 4565450, at *5-*7 (W.D. Tenn. Sept. 29, 2011) (THRA claims subject to same burden-shifting analysis as Title VII claims); *Campbell v. Eagle Bend Mfg. Co.*, 2011 WL 2471493, at *6 n.2 (E.D. Tenn. June 22, 2011) (same); *see also* Tenn. Code Ann. § 4-21-311(3) (2011).

[20]To make out a TPPA claim, a plaintiff must show that (1) she was an employee of the defendant employer; (2) she refused to participate in, or remain or silent about, "illegal activities" as defined under the Act; (3) she was terminated; and (4) she was terminated exclusively because of her refusal to participate in or remain silent about the illegal activities. *Franklin v. Swift Transp. Co., Inc.*, 210 S.W.3d 521, 528 (Tenn. Ct. App. 2008). The plaintiff must show that the whistleblowing activity brought to light an illegal or unsafe practice in furtherance of an important public policy interest. *Guy v. Mut. of Omaha Ins., Co.*, 79 S.W.3d 528, 538 (Tenn. 2002). The Plaintiffs argue that the act of filing a workers' compensation claim somehow constitutes whistleblowing activity, citing to *Anderson v. Std. Register Co.*, 857

S.W.3d 96, 98 (Tenn. Ct. App. 2007). Because the Plaintiffs have raised the TPPA claim for the first time at summary judgment, dismissal is appropriate on that basis alone. In any case, the claim is time-barred because the Plaintiffs have raised it well outside of the one-year limitations period. *See Gibson*, 661 F. Supp. 2d at 912. Third, on the merits, the TPPA is not applicable to the Plaintiffs' allegations, which do not involve any whisteblowing activity.

## III. Legal Standard for Claims Under Title VII and Tennessee Common Law

### (A) Workers' Compensation Discrimination

Tennessee recognizes a cause of action for retaliatory discharge following an employee's claim for workers' compensation. *Anderson v. Std. Register Co.*, 857 S.W. 2d 555, 556-59 (Tenn. 1993); *Reed v. Alamo Rent-a-Car, Inc.*, 4 S.W.3d 677, 684-85 (Tenn. Ct. App. 1999). The cause of action for retaliatory discharge provides "*a narrow exception* to the employment at will doctrine," under which an employer presumptively may terminate an employee for good cause, bad cause, or no cause at all. *Abraham v. Cumberland-Swan, Inc.*, No. 01A01-9201CH00032, 1992 WL 207775, at *3-*4 (Tenn. Ct. App. Aug. 28, 1992) (emphasis added); *Harney v. Meadowbrook Nursing Ctr.*, 784 S.W.2d 921, 922 (Tenn. 1990) ("The long standing rule in this State is that an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all, without being thereby guilty of legal wrong. Either the employer or the employee may terminate the relationship at will.")

To make out a *prima facie* case of retaliatory discharge, a plaintiff must prove that (1) she was an employee of SST at the time of the injury; (2) she made a claim against the employer for workers' compensation benefits, (3) SST terminated her employment; and (4) the claim for

---

S.W.2d 555 (Tenn. 1993). *Anderson* does not stand for this proposition.

workers' compensation benefits was a substantial factor in the employer's motivation to terminate her employment. *Anderson*, 857 S.W. 2d at 558; *Frizzell v. Mohawk Indus.*, No. M2004-01598-COA-R3-CV, 2006 WL 1328773, at *3 (Tenn. Ct. App. May 15, 2006).

To meet the substantial factor requirement of her *prima facie* case, a plaintiff must show either direct or "compelling circumstantial evidence" of a causal connection between the workers' compensation claim and the termination. *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992); *Reed*, 4 S.W.3d at 685; *Frizzell*, 2006 WL 132877, at *3. Tennessee courts have offered guidance about what types of evidence satisfy this standard:

> [A] plaintiff cannot establish causation by testifying that she cannot think of any other reason for her discharge. The plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship.
>
> Moreover, a plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between her on-the-job *injury* and her subsequent discharge. Instead, *the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury*, was the true or substantial reason for her discharge.

*Reed*, 4 S.W.3d at 685 (emphases added); *see also Campbell v. Eagle Bend Mfg., Inc.*, No. 3:10-cv-24, 2011 WL 2471493, at *6 (E.D. Tenn. June 22, 2011) (applying *Reed* and finding that plaintiff had not demonstrated the requisite causal connection). In considering the types of evidence that might meet this standard, the Tennessee Court of Appeals has found as follows:

> In an effort to prove causation, a plaintiff can present circumstantial evidence in numerous forms, to include the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to establish company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

*Newcomb v. Kohler Co.,* 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006) (internal citations omitted).

Temporal proximity alone between the claim and the termination is insufficient. *See Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995) (holding that evidence was insufficient to establish causation, where plaintiff was fired three weeks after receiving workers' compensation and three days after returning to work from the underlying injury); *Cooper*, 570 F. Supp. 2d at 986 (holding that evidence was insufficient to establish causation, where plaintiff was fired five weeks after filing workers' compensation claim).

If the employee makes out her *prima facie* case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the discharge. *Anderson*, 857 S.W.2d at 558; *Frizzell*, 2006 WL 1328773, at * 3. Those reasons "may involve the employee's own shortcomings, such as . . . physical inability to do the job . . . . The legitimate nonpretextual reason may also be one not related to this particular employee, but stemming from general business conditions, particularly as evidenced by the fact there were general layoffs involving, of course, other employees in no way involved in any retaliation." *Anderson*, 857 S.W.2d at 559 (quoting 2A A. Larson, *The Law of Workmen's Compensation*, § 68.36(d), pp. 188-191 (1990)).

If the employer meets this burden, the burden shifts back to the employee to prove that the employer's explanation is pretextual. *Frizzell*, 2006 WL 1328773, at *3. In doing so, the employee "must present specific admissible facts, which realistically challenge the defendant's stated reasons." *Id.* "The plaintiff may challenge the stated reason by showing that the employer's reasons have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or if they were factors, by showing that they were jointly insufficient to motivate the discharge." *Id.* (quoting *Moore v. Nashville Elec. Power*

*Bd.*, 72 S.W.3d 643, 652 (Tenn. Ct. App. 2001) (internal quotation marks omitted)).

(B)     Title VII Gender Discrimination

Claims of gender discrimination under Title VII are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 8023, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004); *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).

To establish a *prima facie* case of gender discrimination, the plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside her protected class or was treated differently than similarly situated, non-protected employees. *DiCarlo*, 358 F. 3d at 415; *White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). In cases involving a reduction in force ("RIF"), such as here, the plaintiff has an added *prima facie* burden to produce additional direct, circumstantial, or statistical evidence that her status as a member of a protected class was a factor in her termination. *See Williams v. Tyco Elec. Corp.*, No. 04-5043, 2006 WL 13105, at *6 (6th Cir. Jan. 3, 2006) (citing *LaGrant v. Gulf & W. Mfg. Co.*, 748 F.2d 1087, 1091 (6th Cir. 1984) ("The mere termination of a competent employee when employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of [gender] discrimination."); *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *EEOC v. Lucent Techs., Inc.*, No. 3:04-0882, 2006 WL 156759, at *4 (M.D. Tenn. Jan. 20, 2006). A RIF occurs when business considerations cause an employer to eliminate one or more positions within the company. *Williams*, 2006 WL 13105, at *6 (citing *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 895 (6th Cir. 1997)). An employee is not terminated as a result

of a reduction in force if she is replaced after her discharge.  *Barnes*, 896 F.2d at 1465.

However, an employee "is not replaced where another employee is assigned to perform the

plaintiff's duties in addition to other duties or when the work is redistributed among other

existing employees already performing related work."  *Id.*

Once the plaintiff meets her *prima facie* burden, the burden shifts to the employer to

produce a legitimate, non-discriminatory reason for the discharge.  *DiCarlo*, 358 F.3d at 414-15.

A RIF constitutes a legitimate, non-discriminatory basis for terminating an employee.  *See Brune*

*v. BASF Corp.*, No. 99-3194, 2000 WL 1597908, at *3 (6th Cir. Oct. 17, 2000); *Lucent*, 2006

WL 156759, at *4.  If the employer meets this burden of production, the burden shifts to the

plaintiff to demonstrate that the employer's stated reason is pretextual.  *White*, 429 F.3d at 245.

To do so, the plaintiff must show, by a preponderance of the evidence, one of the following: (1)

that the proffered reasons had no basis in fact; (2) that the reasons did not actually motivate the

employer's actions; or (3) that the reasons were insufficient to motivate the employer's actions.

*Manzer v. Diamond Shamrock Chems.*, 29 F.3d 1078, 1084 (6th Cir. 1994); *White*, 429 F.3d at

245.  "[Claiming] by a blanket denial that the employer's articulated reasons for [taking the

adverse action] . . . were incorrect . . . is not enough; a plaintiff must take the extra step of

presenting evidence to show that the reasons given are an attempt to cover up the employer's

alleged real discriminatory motive."  *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir. 1987).

As a general matter, it is inappropriate for a court to second-guess an employer's

legitimate business practices.  *Wilkins v. Eaton Corp*, 790 F.2d 515, 521 (6th Cir. 1986) ("The

factfinder may not focus on the soundness of the employer's business judgment . . . ."); *Smith v.*

*Leggette Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the

judiciary to substitute its judgment for that of management"); *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 Fed. App'x 266, 272 (6th Cir. 2006) ("Courts are not intended to act as super personnel departments to second guess an employer's facially legitimate business decisions.").

    (C)    <u>Title VII Retaliation</u>

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C.§ 2000e-3(a) (2011); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Claims of retaliation also proceed under the *McDonnell Douglas* burden-shifting framework. *Imwalle*, 515 F.3d. at 543.

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) the employee has engaged in Title VII-protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Imwalle*, 515 F.3d at 544.

Once the plaintiff has established her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employer's actions. *Imwalle*, 515 F.3d at 544; *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation for engaging in the protected activity. *Id.* As with discrimination claims, a plaintiff can demonstrate pretext by showing that the proffered reason (1)

has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Manzer*, 29 F.3d at 1083; *Imwalle*, 515 F.3d at 545. At this stage, "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Imwalle,* 515 F.3d at 544-45. However, "[r]egardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her]." *Id.* (quoting *Johnson v. Kroger Co.*, 389 F.3d 858, 866 (6th Cir. 2003)); *Manzer*, 29 F.3d at 1083 ("The jury may not reject the employer's explanation . . . .unless there is a sufficient basis *in the evidence* for doing so.") (emphasis in original).

IV. **Application to Crook**

    (A)    Workers' Compensation Retaliatory Discharge Claim

    SST contends that Crook has not shown that her workers' compensation claim was a substantial factor in SST's motivation to terminate her employment.[21] The court agrees that Crook has not met her *prima facie* burden.

    Crook was terminated approximately three years after filing her workers' compensation claim. This substantial gap of time does not even suggest a causal connection between filing the

---

    [21]SST concedes that Crook has established the other three *prima facie* elements, but disputes that Crook has met her *prima facie* or rebuttal burdens. In response to SST's motion, Crook argues that she has made out a claim under the *TPPA* – an inapplicable whistleblower protection statute – but she does not address SST's cited cases under the appropriate common law standard. Notwithstanding this apparent mistake by Crook's counsel, the court will treat the substance of Crook's argument as relating to her common law retaliation claim. (*See* Docket No. 45, p. 10.)

claim and Crook's termination. *See Nickles v. Law Offices of Donald D. Zuccarello*, No. 3:06-cv-0702, 2008 WL 53689, at *6 (M.D. Tenn. Jan. 2, 2008) (one- to two-year span between filing claim and termination insufficient to demonstrate causation, even where workers' compensation lawsuit was still pending at time of termination); *Conatser*, 920 S.W.2d at 648; *Cooper*, 570 F. Supp. 2d at 986. Crook suggests that the fact that she did not settle her workers' compensation claim until July 2009 – *i.e.*, after she was terminated – demonstrates the requisite causal relationship between her workers' compensation claim and her termination. However, Crook identifies no legal authority establishing that the timing of settlement of her claim is relevant to the causal analysis, let alone sufficient to meet it. Indeed, SST has identified authority to the contrary. *See Nickles*, 2008 WL 53689, at *6; *Vaughan v. Harvard Indus.*, 926 F. Supp. 1340, 1350 (W.D. Tenn. 1996) (overruled on other grounds), 185 F.2d 625, 643 n. 4 (1999) ("Finally, the proximity in time between plaintiff's termination and the *settlement* of his worker's compensation claim does not satisfy the causation requirement . . . . [P]laintiff has not explained why the settlement of his claim, as opposed to plaintiff's filing of the claim, would prompt his termination." (emphasis in original).) Regardless, Crook provides no evidence that Mangrum, the individual who recommended her termination, knew that her workers' compensation claim had not been settled, let alone that its pendency played any role in his decision-making process.

Second, irrespective of the lack of temporal proximity, Crook has not produced the requisite compelling circumstantial evidence of discriminatory motive by SST. To the contrary, the record demonstrates that, following Crook's injury and associated workers' compensation claim, SST made every effort to accommodate Crook's medical restrictions over the course of several years, saw her through multiple major surgeries and prolonged convalescence periods,

welcomed her back to work without complaint, gave her positive performance evaluations and periodic pay raises both before and after she filed her claim and retained a workers' compensation attorney, and, even after the company's business contracted, sought to preserve her job as long as possible.  Furthermore, consistent with SST's attempts to preserve the third shift workers' employment (including Crook's), SST in early 2009 folded the third shift into the first shift for several months, even though the consolidation created substantial duplication of responsibilities and resulted in a workforce that Crook admits was obviously larger than what SST actually needed.  Indeed, the first shift already had a supervisor (Burkett) who was more experienced than Crook, had more mechanical knowledge than her, and who was not subject to the myriad restrictions that prevented Crook from performing various tasks at the plant.  Despite Crook's reduced responsibilities, SST generously continued to pay Crook a supervisor-level wage for several months.  Also, as soon as the opportunity arose, SST permitted Crook to perform a relatively light supervisory role on a temporary second shift for six weeks.  These actions are entirely inconsistent with discriminatory motive.  *See Vaughn v. Food Lion, LLC*, No. 3:04-cv-277, 2005 WL 1648189, at *3-*4 (E.D. Tenn. July 8, 2005) (finding that employer was entitled to summary judgment, where employer employed plaintiff for two years after workers' compensation injury, gave employee ample time to heal before returning to position, and accommodated plaintiff by creating temporary position during interim periods).

Furthermore, Crook does not identify any evidence that the workers' compensation claim played any role in Mangrum's decision to include her in the workforce reduction.  Even when SST terminated her, SST designated Crook as "eligible for rehire," indicating that it could have rehired Crook under appropriate circumstances.  Finally, the statistics concerning SST's

workforce reductions demonstrate no discernable pattern of discrimination on the basis of workers' compensation claims, nor does Crook even attempt to identify such a pattern. Indeed, several individuals who filed workers' compensation claims were terminated in early 2009, but at least 17 employees who filed workers's compensation claims were retained, and 13 remain SST employees. Taken cumulatively, no reasonable jury could find that these facts provide "compelling evidence" that SST terminated Crook because she filed a workers' compensation claim. *See Newcomb*, 222 S.W.3d at 391.

The purported contrary evidence cited by Crook is unavailing. Crook argues that she met the expectations of her supervisors, including performing certain tasks that allegedly exceeded her medical restrictions "under threat of immediate termination." (Docket No. 45 at p. 10.) This is an exaggeration, as SST merely told Crook in early 2009 that limited work was available and that, if Crook could not perform certain forms of work at the plant, there was simply nothing for her to do. Crook's argument also ignores the fact that, shortly after SST made these comments, Mangrum gave her a light supervisory position to perform on the temporary second shift for six weeks. Moreover, Crook's argument is largely beside the point. The crux of a workers' compensation retaliatory discharge claim is whether the employer terminated the employee because of her *claim*, not because of her *injury*. *See Reed*, 4 S.W.3d at 685 ("[T]he plaintiff must show that her *claim* for workers' compensation benefits, as opposed to her *injury*, was the true or substantial reason for her discharge.") (emphases added). Indeed, "a plaintiff may not satisfy the causation requirement merely by showing that her employer required her to return to work over her objection that she was medically unable to work." *Id.* Thus, Crook's complaints about SST's purported failure to accommodate her injury cannot support a causal inference. Indeed,

SST ultimately was entitled to consider physical limitations, among any other permissible factors, in reaching a business decision whether to terminate Crook as part of the RIF. *See Anderson*, 857 S.W.2d at 558-59 ("physical inability to do the job" is a legitimate, non-pretextual reason for termination); *Ellis v. Buzzi Unicem USA*, No. 1:06-cv-96, 2007 WL 1464594, at *9 (E.D. Tenn. May 16, 2007) (finding that termination because of a physical limitations is "unquestionably a valid reason if non-pretextual" and observing that "[t]he baseline question here is whether Plaintiff can prove Defendant retaliated against him for filing a workers' compensation claim . . . *not* that Plaintiff was discharged because of his compensable injury") (emphasis in original).

Second, Crook argues that the two comments by Joseph – one in March 2009 before her termination, one at the April 2, 2009 meeting in which Crook was terminated – establish retaliatory motive by SST. As an initial matter, neither comment necessarily concerned Crook's workers' compensation claim. The first comment appears to reflect Joseph's frustration with the restrictions imposed by Crook's injury, under which the company had repeatedly reduced her workload while continuing to pay her a supervisor's salary. The second alleged comment, that "[e]ven if you have restrictions or not, this is nothing personal," does not even suggest that Joseph was frustrated with Crook's filing a workers' compensation claim years earlier. Thus, these statements do not support a causal inference. Regardless, even if Joseph's statements could be interpreted as reflecting hostility towards Crook's workers' compensation claim, the undisputed facts indicate that Mangrum, not Joseph, was the decision-maker who recommended that Crook be terminated as part of the reduction in force. Thus, two stray remarks by Joseph, an individual who did not decide to terminate Crook, do not constitute compelling evidence of

retaliatory animus, particularly where there is no evidence that Mangrum, the actual decision-maker, was motivated by anything other than legitimate business considerations.  *See Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, Nos. 3:07-0979, 3:08-0031, 2010 WL 3342211, at *13 (M.D. Tenn. Aug. 24, 2010); *Dedman v. Sam's E., Inc.*, No. 08-2690-STA, 2009 WL 2905916, at *5-6 (W.D. Tenn. Sept. 4, 2009).

Even assuming *arguendo* that Crook met her *prima facie* burden, Crook has not rebutted SST's contention that it terminated Crook because of business needs associated with a reduction in force, which bore no relationship to her workers's compensation claim asserted several years earlier.  Mangrum sought to preserve Crook's employment as long as possible.  However, Crook was unable to, and/or not adequately trained to, perform various job-related tasks, including certain tasks essential to setting up machines in the new building.  Furthermore, following the shift consolidation, Crook's role as a second supervisor was essentially duplicative of the role already performed by Burkett on that shift.  When it became untenable for SST to retain its current workforce, Mangrum made a business decision to terminate Crook, and there is no evidence in the record that the stale workers' compensation claim played any role in that decision.  For these reasons – and for many of the same reasons that Crook has not established a causal connection – no reasonable jury could conclude that SST's alleged business decision to terminate Crook in April 2009 was a pretext for discharging her for filing a workers' compensation claim years earlier.

(B)  Title VII Gender Discrimination Claim

Crook alleges that she was terminated and not rehired because of her gender.  She seeks to prove this claim through circumstantial evidence.

As an initial matter, the court finds that Crook was terminated as part of a RIF.  SST eliminated over half of its operational workforce at the Gallatin plant due to reduced demand for its Quik Drive product line.  Furthermore, contrary to Crook's contentions, she was not "replaced" by Biggs, the lead hand who came back from furlough during the same time frame in which Crook was terminated.  Crook was a supervisor, while Biggs was a lead hand, *i.e.*, they performed different roles in the company.  The fact that Crook had once, several years earlier, served as a lead hand is irrelevant.  Moreover, SST brought back Biggs from furlough to perform specific tasks associated with the plant move that Crook could not perform due to physical limitations and/or lack of training.  Thus, Crook was not "replaced," and the court finds that SST's early 2009 layoffs constituted a reduction in force.  *See Barnes*, 896 F.2d at 1465.  Because Crook was terminated as part of a reduction in force, she must produce additional direct, circumstantial, or statistical evidence that her status as a member of a protected class was a factor in her termination.  *See Williams*, 2006 WL 13105, at *6.  Crook has not met her *prima facie* burden in multiple respects.

In support of her *prima facie* case, Crook simply states as follows: "Plaintiff was subjected to disproportionate work loads and work assignments when it came to covering breaks than her male counterparts [sic] as well as termination and rehire.  Defendant rehired Chris Biggs as a lead hand even though Plaintiff had the qualifications to perform that job and had actually done so prior to termination."  (Docket No. 45 at p. 10.)  Crook does not identify for the court which alleged work loads and work assignments she believes were "disproportionate."  At any rate, aside from her boilerplate recitation of the *McDonnell Douglas* legal standard, Crook does not even attempt to analogize these facts to any particular case, nor does Crook even address

SST's specific arguments as to why Crook has failed to establish her *prima facie* burden and cannot demonstrate pretext.

With respect to work assignments, Crook, at deposition, did make some vague and speculative allegations about Mangrum's treatment of male employees relative to female employees at unspecified times, such as Mangrum's alleged tendency to let male employees "get away with more stuff." Even if true, these isolated incidents do not establish that gender played a role in Mangrum's decision to terminate Crook. Indeed, Crook admits that Mangrum weighed Crook's abilities against those of Burkett and other employees when deciding which employees to terminate.

Although Crook complained about her responsibilities relative to Burkett and two male lead hands following the January 2009 shift consolidation, there is no evidence that these assignments were gender-based. SST permitted Burkett, the existing first shift supervisor with more experience than Crook, to continue his supervisory role. Mangrum asked Crook and two lead hands – one male, one female – to assist with break coverage and assigned Crook to cover on the two lightest machines, apparently in an effort to give her a continuing role on the consolidated shift. Mangrum assigned the other two lead hands to perform other work. The fact that Crook simply disagreed with Mangrum's assessment of her limitations and the appropriate delegation of workplace tasks does not provide circumstantial evidence of gender discrimination.

Even assuming *arguendo* that Crook met her *prima facie* burden, her gender discrimination claim must fail. SST asserts that Crook was terminated as part of a RIF, satisfying its burden of production. Crook's brief does not address SST's argument that it terminated Crook as part of a RIF, nor does Crook identify any facts tending to show that the

RIF justification has no basis in fact, did not actually motivate SST, or that the RIF was insufficient to warrant her termination. *See Manzer*, 29 F.3d at 1089. In fact, Crook admits that, as of early 2009, SST was obviously employing more workers than necessary at the Gallatin plant. Furthermore, Crook has not shown that Mangrum's decision to retain Burkett, who was more experienced and was not subject to workplace medical restrictions, was motivated by gender rather than SST's business needs. Similarly, to the extent it is even relevant, Crook has made no showing that gender motivated SST's decision to bring Biggs back from furlough, where Biggs possessed knowledge and skills necessary to complete the plant move. Finally, there is no discernable pattern of gender discrimination in the breakdown of employees laid off in early 2009, nor does Crook even attempt to identify one. Indeed, approximately two-thirds of the Gallatin operational workforce was female and approximately two-thirds of the employees laid off were female.

The failure to rehire claim, even if cognizable, is meritless. Crook has been physically unable to work since she was terminated, and she has provided no evidence that she sought to be rehired by SST, let alone that gender motivated SST in any of its decision-making after her termination in April 2009. Thus, there is no evidence from which a reasonable jury could conclude that SST's decision to terminate and/or not to rehire Crook was pretextual.

(C)     Title VII Retaliation Claim

Crook's statutory retaliation claim has been a moving target. In her Complaint, Crook alleged that "the intentional acts and omissions as described herein by the defendant constitutes [sic] adverse employment actions of retaliation *for filing charges of discrimination* under either Title VII or the Tennessee Human Rights Act . . . ." (Crook Complaint at ¶ 1) (emphasis added).

At summary judgment, Crook now argues that SST retaliated against her for complaining about break coverage and other tasks she believed exceeded her medical restrictions, *i.e.*, conduct not involving filing charges of discrimination that occurred *before* she was terminated. Furthermore, although it was not clearly articulated in her Complaint, Crook argues in her Response brief that SST retaliated by terminating her *and* by failing to rehire her. Even assuming that Crook properly raised these allegations in her Complaint, the Title VII retaliation claims under either theory each fail for several reasons.

First, having examined the record, the court finds that Crook has not demonstrated that she engaged in any protected activity before filing her EEOC/THRC discrimination charge in September 2009 – nearly six months after she was terminated. Although Crook complained about her work assignments prior to termination, Crook did not complain about gender discrimination or, for that matter, any other form of activity protected by Title VII. Accordingly, the act of filing the September 2009 discrimination charge cannot logically support a finding of retaliatory discharge in April 2009. Even assuming *arguendo* that Crook complained to SST about gender discrimination in her workplace assignment on January 5, 2009, she has not demonstrated any causal connection between that complaint and her termination three months later or that SST's basis for terminating her was pretextual, for the reasons articulated in the previous section.

Second, as to the purported claim for retaliatory failure to rehire, Crook does not even allege that she sought to be rehired and admits that she has been physically unable to work since her April 2009 termination. Under these circumstances, no reasonable jury could logically find that SST retaliated against Crook by failing to rehire her. Moreover, Crook has not produced

any evidence demonstrating that, after she filed the September 2009 charge, gender played any role in SST's decision-making.[22]

## V.    **Application to Sullivan**

### A.    Workers' Compensation Retaliatory Discharge Claim

Sullivan contends that she was discharged in February 2009 in retaliation for filing a worker's compensation claim in April 2005. SST concedes that Sullivan has demonstrated the first three elements of her *prima facie* case, but argues that Sullivan failed to establish the "substantial factor" element of her *prima facie* case and has not demonstrated that SST's basis for terminating her was pretextual.

In support of her claim, Sullivan argues that certain circumstantial evidence demonstrates a causal connection between her claim and her termination.[23] Sullivan points out that she received positive performance evaluations before her termination and contends that she could have continued to perform the essential functions of the job. She also alleges that, in December 2008, Joseph told her that she had cost the company too much money. She also points out that she was terminated just days after settling her workers' compensation claim. Finally, she contends that SST rehired certain employees to fill a position that she had previously held. In

_____

[22]SST also contends that Crook's retaliation claims should be summarily dismissed because Crook did not explicitly assert a retaliation claim in her September 2009 charge (Crook Docket No. 48, Ex. G). Because the court disposes of Crook's claims for retaliatory discharge and failure to rehire fail on the merits, the court need not address this exhaustion argument. *See Hill v. Nicholson*, 383 Fed. App'x 503, 508 (6th Cir. 2010).

[23]As with Crook, Sullivan erroneously purports to analyze the retaliatory discharge claim under the TPPA. For that reason, Sullivan similarly does not identify any case law concerning the appropriate Tennessee common law standard, let alone does she address the cases identified by SST in support of its motion for summary judgment. Notwithstanding this oversight, the court will treat the substance of Sullivan's argument as relating to her common law retaliation claim. (*See* Docket No. 31 at p. 9.)

response, SST contends that these facts are unsupported and/or immaterial.  Furthermore, SST argues that the temporal proximity between Sullivan's termination and the *settlement* of her claim – rather than the earlier assertion of that claim – is irrelevant, a point to which Sullivan has not responded.

Sullivan plainly has not met her *prima facie* burden to provide compelling evidence that SST terminated her in February 2009 because she had reported a workers' compensation injury in April 2005.  Nearly four years elapsed between the claim – which SST's carrier accepted – and Sullivan's termination, which does not support an inference of causation.  *See Nickles*, 2008 WL 53689, at *6; *Conatser*, 920 S.W.2d at 648; *Cooper*, 570 F. Supp. 2d at 986.  Furthermore, the undisputed facts concerning SST's conduct do not support any finding of a causal connection between Sullivan's claim and her termination four years later.  For example, after Sullivan reported her claim, SST assisted Sullivan in switching workers' compensation doctors to obtain a suitable diagnosis, employed her for approximately four more years, gave her three positive performance reviews and four pay increases, and specifically found a position for her in the Quality Unit to accommodate her medical restrictions.  None of these actions reflects retaliatory motive.

Moreover, Sullivan has not produced any evidence that the 2005 claim played a role in Cordray's decision-making process to recommend Sullivan for termination.  Nor has Sullivan sought to establish any pattern of discrimination by SST against employees who filed workers' compensation claims.  To the contrary, as discussed *supra* at p. 30, the evidence shows that SST terminated some individuals who had filed workers' compensation claims and retained others, while terminating some individuals who had never filed workers' compensation claims.

Also, as of Sullivan's termination, SST's workers' compensation carrier had been paying

Sullivan's medical bills and temporary disability benefits since 2005. The fact that Sullivan did not resolve one disputed component of her claim – the permanency component – with the carrier until early 2009 does not suggest retaliatory animus by SST, nor does Sullivan explain why the ultimate settlement of her claim with the carrier supports an inference that SST therefore retaliated against her. *See Vaughan*, 926 F. Supp. at 1350; *Nickles*, 2008 WL 53689, at *6.

With respect to Joseph's alleged comment to Sullivan in December 2008, the court finds that it constitutes a stray remark by a non-decision maker that does not support an inference of discrimination. *See Johnson*, 2010 WL 3342211, at *13; *Dedman*, 2009 WL 2905916, at *5-6. It was Cordray, not Joseph, who included Sullivan in the reduction in force, and Sullivan has produced no evidence to the contrary. Also, the fact that SST hired a temporary lab worker in September 2009 does not suggest that SST terminated Sullivan eight months earlier because she had filed a workers' compensation claim in 2005. Accordingly, the court finds that Sullivan has not met her *prima facie* burden.

Even assuming *arguendo* that Sullivan met this burden, her claim must fail because she has not rebutted SST's contention that it terminated her as part of a RIF, which constituted a legitimate, non-discriminatory reason for her termination. *See Anderson*, 857 S.W.2d at 559. Cordray ultimately decided to retain Smith over Sullivan because Smith was in a higher-level position with more overall knowledge and responsibility in the quality lab – Smith had 20 years of experience to Sullivan's four – and was more proficient than Sullivan in certain important job tasks. The fact that Sullivan subjectively believes that she could have been retained over Smith does not support a finding that SST's facially reasonable business decision to terminate Sullivan – along with half of its entire Gallatin plant operative workforce – was a pretext for retaliation. At any rate, SST was entitled to terminate Sullivan in January 2009 for good cause, bad cause, or

no cause at all, provided that it did not terminate her in retaliation for filing a workers'
compensation claim in early 2005.[24]

B.    Title VII Gender Discrimination

Sullivan's Title VII gender discrimination claim plainly fails on the merits.  An essential
element of her *prima facie* case is that she demonstrate that she was replaced by a male
employee or treated differently than a similarly situated male employee.  Sullivan has not made
this showing.  When she was terminated, the department consisted only of female employees:
herself, Smith, and Cordray.  Cordray ultimately chose to retain Smith over Sullivan.  Thus,
Sullivan cannot demonstrate that she was treated differently than a similarly situated male
employee when she was terminated.  Although the lab ultimately hired another female technician
(Andrews), there is no evidence that Sullivan was replaced by a male employee.[25]

Even if Sullivan had been replaced by a male employee, she cannot demonstrate pretext.
There is no evidence in the record that Sullivan's gender played any role in Cordray's facially
reasonable business decision to terminate Sullivan while retaining Smith.  Cordray believed that,

_____

[24]Sullivan also appears to argue that SST retaliated against her by failing to rehire her in
favor of another technician, Andrews.  Sullivan provides no legal authority that Tennessee
recognizes a claim for workers' compensation retaliatory failure to rehire.  Even if such a claim
existed, Sullivan has not substantiated it here.  Andrews had more quality lab experience than
Sullivan, including experience with new sophisticated lab equipment that SST had purchased
after Sullivan's termination.  Absent any indicia of improper motive, SST's decision to hire
Andrews – first as a temporary employee, then as a full-time employee – to meet new business
needs is entitled to deference.  *See Lucent*, 2006 WL 156759, at *6.  Sullivan did not reapply to
SST after her termination, in any case.

[25]Although Sullivan's counsel asserts that "male employees were re-hired or transferred
into the lab after her termination," (Docket No. 31 at p. 11), there is no support for this statement
in the record.  Even if some male employees had been asked to perform, in addition to their other
duties, some of the work that Sullivan had been performing, that fact would not establish that
Sullivan was "replaced" by those employees.  *See Barnes*, 896 F.2d at 1465.

with the reduction in force, she needed to retain a lab employee who could perform all of the lab functions by herself. Cordray determined that only Smith could fill that role going forward and, therefore, retained her and terminated Sullivan. Finally, the statistics indicate that SST retained both female and male employees who had incurred workers' compensation claims and terminated both female and male employees who had not, in no evident gender-based pattern.

C.    Title VII Retaliation

Sullivan's retaliation claim plainly fails as well. The entire substance of her retaliation claim comprises one sentence: "Since the filing of the EEOC claim, Plaintiff has not been called back for work." (Sullivan Docket No. 31 at p. 16.) SST validly complains that Sullivan did not articulate a failure to rehire claim in her Complaint, although the court notes that, as with Crook, Sullivan's Complaint did include a vague allegation that SST retaliated against Sullivan for filing discrimination charges.[26] Regardless, Sullivan's Title VII retaliation claim fails on the merits.

First, Sullivan has presented no evidence that she sought to be re-hired between her termination and the Andrews hiring. Thus, unlike the other two employees whom SST did re-hire, Sullivan did not re-apply or otherwise inquire about a job with SST after her termination.

Second, Sullivan has not produced any evidence that the fact that she filed a charge of discrimination in late 2009 impacted SST's subsequent hiring process in any way. The record simply indicates that SST hired Andrews as a lab technician eight months after Sullivan was terminated and that SST re-hired two former employees who re-applied for positions and were

---

[26]As with Crook, SST contends that Sullivan's retaliation claim should be dismissed because Crook did not explicitly assert a retaliation claim in her EEOC/THRC charge (Sullivan Docket No. 34, Ex. G). Because Sullivan's retaliation claims plainly fails on the merits, the court need not address this argument. *See Hill v. Nicholson*, 383 Fed. App'x at 508.

placed in departments other than the quality lab. The mere fact that SST did not re-hire Sullivan after she filed her EEOC/THRC discrimination claim, standing alone, does not support a causal inference or a finding of pretext.

## CONCLUSION

For the reasons stated herein, the motion as to Crook and the motion as to Sullivan will both be **GRANTED**. Appropriate orders will enter.

ALETA A. TRAUGER
United States District Judge